REAGAN, ASSIGNEE, ET AL. *v.* FIRST NATIONAL BANK OF CHICAGO ET AL.

[No. 19,001.   Filed Oct. 8, 1901.   Rehearing denied Feb. 4, 1902.]

CORPORATIONS.—*Preferred Stock.*—*Mortgages.*—Under the provisions of §5064 *et seq.* Burns 1901, that in case of insolvency or dissolution of certain corporations the debts of such corporations shall be paid in preference to preferred stock therein, a mortgage executed by an insolvent corporation securing holders of preferred stock over general creditors is void as to such stockholders.   *pp. 639-647.*

SAME.—*Mortgages.*—*Preferred Stock.*—*Fraud*—Where an insolvent corporation, by mortgage, preferred holders of preferred stock over general creditors in violation of statute, the fact that the officers of the corporation honestly believed that it had the right to secure such stockholders will not overcome the presumption that such officers intended the fraud which resulted.   *pp. 644-647.*

SAME.—*Insolvency.*—*Mortgage Securing Holders of Preferred Stock in Violation of Statute.*—An insolvent corporation executed a mortgage to a trustee for the benefit of certain creditors, and included therein the holders of preferred stock in violation of the provision of §5064 *et seq.* Burns 1901, that general creditors shall be paid in preference to such preferred stock.   The mortgage contained a provision that all of the mortgagees were to share *pro rata* without priority, except one of the creditors thereby secured, whose claim was to be second and junior to those of the other mortgagees.   The mortgagees accepted the mortgage and sought to avail themselves of its benefits as against the trustee for general creditors.   *Held,* that one of the beneficiaries cannot assail or repudiate any of the claims of his cobeneficiaries, and that the contract is inseparable and invalid in its entirety as against the trustee for general creditors.   *pp. 647-667.*

NOTICE.—*Of Insolvency.*—*Debtor and Creditor.*—Where a creditor of a corporation has notice of such facts or circumstances which ought to put him upon inquiry as to the insolvency of the corporation, but, instead of doing so, avoids making any inquiry, the law will impute to him notice of such facts as he could have ascertained had he exercised ordinary diligence.   *p. 667.*

MORTGAGES.— *Assignment for Benefit of Creditors.— Insolvency.—* Where an insolvent corporation on the day it executed a mortgage to a trustee for the benefit of certain creditors, and before any of the beneficiaries therein named had accepted it, or had any knowledge of the fact that it had any existence, made a voluntary assignment for the benefit of creditors, such mortgage cannot be enforced as against the rights of creditors under the assignment. *pp. 667-669.*

SAME.—*Assignment for Benefit of Creditors.—Acceptance of Mortgage.* —Where mortgaged property, before acceptance on the part of the mortgagees, passed under the supervision and control of the court under an assignment for the benefit of creditors, the mortgagees cannot, by accepting the mortgage thereafter, have their acceptance relate back, and thereby make the mortgage effectual as a lien prior to the recording of the deed of assignment. *pp. 669, 670.*

SAME.—*Corporations.—Insolvency.—Assignment for Benefit of Creditors.—Acceptance of Mortgage by Junior Mortgagee.*—Where an insolvent corporation included the holders of preferred stock in a mortgage to secure certain creditors, in violation of law, creditors secured by a second mortgage, which by its express terms is made subordinate and subject to the first mortgage, will not be presumed to have accepted the same, since such mortgagees would be thereby precluded from assailing the fraudulent claim of the preferred stockholders. *p. 670.*

SAME.—*Acceptance of Mortgage by Trustee.—Corporations.—Insolvency.*—Where an insolvent corporation, in the execution of a mortgage to a trustee for the benefit of certain creditors, made the same subject to such conditions as would overthrow the presumption of acceptance on the part of the mortgagees, the acceptance by the trustee appointed by the mortgagor will not amount to an acceptance on the part of the mortgagees. *p. 671.*

From Marion Superior Court; *Vinson Carter,* Judge.

Action by the First National Bank of Chicago, and others, against John Reagan, assignee of the Krag-Reynolds Company, and others, in which the assignee filed a cross-complaint. From a judgment for plaintiffs for part of relief asked, the assignee and other defendants appeal. *Reversed in part and affirmed in part.*

*W. T. Brown, A. C. Ayres, A. Q. Jones, J. E. Hollett, W. H. H. Miller, J. B. Elam, J. W. Fesler, S. D. Miller, G. E. Hume, W. A. Ketcham, E. E. Gates* and *H. J. Milligan,* for appellants.

*N. Morris, L. Newberger, O. B. Jameson, F. A. Joss, J. W. Holtzman, L. A. Coleman, C. W. Smith, J. S. Duncan, H. H. Hornbrook, A. Smith, A. Baker* and *E. Daniels,* for appellees.

JORDAN, J.—On December 29, 1897, the First National Bank of Chicago, as plaintiff below, instituted this action. Afterwards on December 31, 1897, an amended or supplemental complaint was filed setting out the execution of two chattel mortgages, each executed by the Krag-Reynolds Company, a corporation doing business at the city of Indianapolis. The first of these mortgages was dated December 21, 1897, and was executed to one Lafayette Perkins as trustee, to secure the claims of certain beneficiaries therein named. The second mortgage in question was executed on December 27, 1897, to said Perkins as trustee, to secure the claims of beneficiaries therein mentioned. A part of the relief sought by the amended complaint was (1) to have the court adjudge that Harrie N. Reynolds, Alfred B. Gates, and Nicholas McCarty Harrison, had no right or interest in or to the property or funds embraced in the first mortgage; (2) for the removal of Perkins, as trustee of said mortgage, and the appointment of a receiver in his stead, to carry out the provisions of said instrument. Various reasons for the removal of the trustee were assigned, among which was that the duties to be discharged by him under the stipulations of each of the said mortgages were conflicting. The complainant also prayed for the appointment of a receiver *pendente lite* to take charge of the mortgaged property and dispose thereof under the order of the court. Perkins as the trustee, by virtue of the aforesaid mortgages, and Reagan, appellant herein, as the assignee of the Krag-Reynolds Company, together with plaintiffs' co-beneficiaries and all persons concerned or interested in the proceedings were made defendants and filed their respective pleadings. Each of plaintiffs' co-beneficiaries under the first mortgage

filed complaints seeking to recover judgments upon their respective claims and a foreclosure of the mortgage, except Nicholas McCarty Harrison, who filed a disclaimer of any interest or right in the property or funds covered by the first mortgage, until after the payment of the creditors of the Krag-Reynolds Company. Reagan, trustee, filed a cross-complaint against the plaintiff and all of his codefendants, including Perkins, as trustee. He alleged in his cross-complaint that each of the said mortgages was void and of no effect so far as he, the trustee, was concerned, because (1) that each of said instruments was executed with the intent to hinder, delay, and defraud the creditors of the insolvent concern; (2) that the first mortgage was obtained by means of a fraudulent agreement to include therein as creditors certain mentioned preferred stockholders of said company; (3) that neither of said mortgages had been accepted by the beneficiaries therein named until after the deed of assignment executed by said Krag-Reynolds Company had been duly recorded in the recorder's office of Marion county, Indiana. Issues were finally joined upon the pleadings filed by the respective parties, and with the consent of Perkins, trustee, a receiver was appointed to serve in his place and stead in the administration of the trust created under the first mortgage. There was a trial by the court, and upon request a special finding was made, upon which the court stated its several conclusions of law in respect to each of the mortgages involved. By its conclusions, the court affirmed in part the validity of the first mortgage of December 21, 1897, and thereby held it to be a valid security in favor of all the beneficiaries therein named, except Nicholas McCarty Harrison and Alfred B. Gates, assignee of Harrie N. Reynolds. In respect to the notes or claims of Gates and Harrison of $25,000 each, which were executed by said company as hereinafter shown, in consideration of the surrender of preferred stock, and secured by the mortgage in question, the court held the security invalid to the

extent of these two claims, so far as Reagan, trustee, was concerned or affected thereby. Or, in other words, the conclusions of the court were to the effect that the claims of Harrison and Gates, by reason of the statute applicable thereto, were not entitled to be paid as provided by the mortgage; that the payment thereof must be postponed until all the other creditors of the insolvent company not embraced in the first mortgage had been paid in full. To the extent of this holding, Reagan as trustee, under his cross-complaint, prevailed in his effort to set aside the first mortgage. The court's conclusions as to the second mortgage in issue were to the effect that it was invalid in its entirety as against Reagan, trustee, except as to any surplus arising out of the administration of his said trust and remaining in his hands after the payment of all claims upon final settlement.

Exceptions to the court's conclusions of law were reserved by all the parties aggrieved thereby, and over motions for a new trial the court rendered its judgment and decree, whereby, among other things, it ordered that the proceeds arising out of the property embraced in the first mortgage should be applied in the following order of priority: (1) To the payment of the costs and expenses of the suit and the receivership herein; (2) to the payment of any judgment that may be rendered against the receiver in this action in favor of intervening petitioners, or persons asserting claims by way of replevin suits or petitions; (3) to the payment *pro rata* of the claims of the Capital National Bank, Indiana National Bank, Nicholas McCarty, and Eppens, Smith & Weiman Company, as found in the special finding; (4) to the claim in favor of the plaintiff, First National Bank of Chicago, as found in the special finding; (5) the residue, if any, to be paid to the cross-complainant, John Reagan, trustee, to be administered under the terms of his trust. Motions to modify the special finding, the conclusions of

law thereon, and also the judgment and decree, were filed by appellants herein, and overruled by the court. Reynolds, the trustee, Alfred B. Gates, and other parties aggrieved by the judgment of the court have appealed and separately assign errors by which they present for review the various conclusions, rulings, and decisions of the trial court.

The special finding is quite lengthy, and in part, at least, we have merely summarized therefrom such facts as we deem essential to the particular question or questions necessary, in our opinion, to be considered in determining this appeal. The following may be said to be the facts which we deem essential to set out in this opinion: On October 25, 1894, the Krag-Reynolds Company was incorporated under the laws of this State for the purpose of doing business at the city of Indianapolis, Indiana; the business to be carried on by this incorporated company was that of the "buying and selling of merchandise and the conducting of mercantile operations, to wit, the preparing of coffees for the market and selling the same; the buying of all kinds of spices, grinding them and fitting them for the market, and selling the same; the buying of buckwheat and manufacturing the same into buckwheat flour for the market and selling the same, and the purchase or manufacture and sale of all kinds of goods which are ordinarily connected with and incidental to the practical operation of the wholesale grocery business." The capital stock of the company was $100,000, of which $50,000 was common stock, and $50,000 was preferred stock; the latter stock by its terms entitled the holder thereof to a semiannual dividend of four per cent. before any dividends should be declared or paid to the holders of the common stock; the right to redeem the preferred stock at any time after the expiration of ten years from the issuing thereof was reserved by the corporation in its articles of association; at the expiration of thirty years such preferred stock was to be payable absolutely. Alfred B. Gates and Nicholas

McCarty Harrison were the holders of the preferred stock, each holding $25,000 thereof; William A. Krag, Charles M. Reynolds, and William W. Krag were the promoters and incorporators of the association; Charles M. Reynolds was made president and treasurer, and also the company's financial manager; Nicholas McCarty Harrison was one of the directors. On December 20, 1897, the Krag-Reynolds Company was an insolvent concern, its indebtedness and liabilities being largely in excess of its assets, and far in excess of its ability to pay, and it still continues to be an insolvent concern. On December 21, 1897, the indebtedness of the incorporation, including the two notes held by Harrison and Gates for the preferred stock, amounted to $365,000, and the actual assets of the corporation did not exceed, as a going concern, $250,000; Charles M. Reynolds, the president, treasurer, and general manager, as heretofore stated, of the said company, on and prior to December 21, 1897, knew that said company was insolvent. In its insolvent condition the company, through its officers, as it appears, desired to make a mortgage upon its property to secure certain creditors. It was informed, however, by its legal advisers that, in order to execute such a mortgage, the company must first procure the written consent of the holders of a majority of its preferred stock. Thereupon certain negotiations were commenced between Charles M. Reynolds as president, etc., which finally led up to the surrender of the preferred stock held by Gates and Harrison, in consideration of the company executing to each of these preferred stockholders a note for $25,000, and securing the payment thereof by the mortgage executed December 21, 1897, as hereinafter stated. The facts in regard to the scheme adopted to secure the consent of the preferred stockholders that this mortgage might be executed are more fully and particularly disclosed by the fiftieth paragraph of the court's special finding, which is as follows: "The court further finds that on the 20th day of December, 1897,

Charles M. Reynolds, the president and treasurer of the Krag-Reynolds Company and its chief manager, advised his attorneys, Hord and Perkins, that the corporation was embarrassed and needed more money; that he thought it could be obtained by increasing the capital stock and inducing the New York creditors to take such stock, in exchange for the notes held by them against the corporation, but in the meantime he wanted to make a mortgage to secure the Indiana National Bank, the Capital National Bank, Nicholas McCarty, the First National Bank of Chicago, and the Eppens, Smith & Weiman Company, whatever might happen; that thereupon he was advised by Hord and Perkins that under the statutes of Indiana the corporation was not authorized to mortgage its property without the written consent of the holders of the majority of the preferred stock, and that it was not likely that they would consent unless in some way they were provided for; that thereupon the plan was advised by Hord and Perkins, and accepted by said Reynolds on behalf of said corporation to redeem or take up such preferred stock, giving to the holders thereof the notes of the corporation for like amounts; that to accomplish this end, and enable the corporation to give said mortgage and avoid the necessity of getting such written consent, negotiations were commenced between said Reynolds and said Gates and Harrison, which finally resulted in redeeming or taking up the preferred stock, giving to the preferred stockholders in place thereof the notes of the corporation, making Gates and Harrison creditors for $25,000 each, instead of preferred stockholders for like amounts, and securing said notes in the first mortgage of December 21, 1897; * * *. At the commencement of said negotiations with Gates and Harrison it was not the intention of said Krag-Reynolds Company to include the notes of said Gates and Harrison in said mortgage, and the determination to include them was not entered upon until said Gates had declined to accept a note, with-

out security, for his stock, and then, in order to satisfy
Gates, it determined to include the Gates and Harrison notes
in said mortgage". After the execution of these notes to the
preferred stockholders in lieu of their stock, a meeting of the
directory and stockholders of said Krag-Reynolds Company
was held on December 20, 1897, at which meeting a resolu-
tion was adopted by which it was ordered that the company
should execute a chattel mortgage to Lafayette Perkins as
trustee, upon the entire stock of goods, wares, and mer-
chandise, etc., held and owned by the company, to secure
the indebtedness or claims of certain creditors who were
thereafter named as the beneficiaries in the mortgage in ques-
tion, which bore date of December 21, 1897. It was on the
same day further provided by the company, by a resolution
adopted, that the mortgage should be in such form and tenor
and to contain such provisions and stipulations as the direct-
ors of the company in their judgment might deem to be
best. Immediately after the adoption of the resolution, the
board of directors held another meeting at which the form,
conditions, and stipulations of the mortgage to be executed
were arranged. Thereafter, on the same day, December 20,
1897, the mortgage of date of December 21st, was executed
by the company to Lafayette Perkins, as aforesaid, and by
him accepted. This mortgage covered the entire stock of
goods, wares, and merchandise of the company, and the
claims of the beneficiaries therein named and secured
amounted to $130,000 and over. The following are some
of the material parts of the mortgage: The instrument at
its beginning states that the Krag-Reynolds Company, a
corporation, etc., "in consideration of the sum of $129,-
399.93, etc., has bargained and sold and does hereby grant,
bargain, sell, assign, transfer, set over, deliver, and confirm
unto Lafayette Perkins, of Marion county, in the State of
Indiana, as trustee, for each and all of the persons, firms,
and corporations following, that is to say, the Indiana Na-
tional Bank of Indianapolis, the Capital National Bank of

Indianapolis, Harrie N. Reynolds of Dayton, Ohio, Nicholas McCarty Harrison of Indianapolis, Nicholas McCarty, the Eppens, Smith & Weiman Company of New York, and the First National Bank of Chicago, the following personal property, etc. [Here follows a description of the property and funds mortgaged.] Provided always that these presents are upon the condition that, whereas, said Krag-Reynolds Company is indebted and liable to the aforesaid persons, firms, and corporations as follows:" (Here follows a description of the respective claims, among which is named the note of Harrie N. Reynolds of $25,000 and the note of Nicholas McCarty Harrison for a like amount, each bearing date of November 1, 1897.) The mortgage further provides as follows: "Now, therefore, if the said mortgagor, the Krag-Reynolds Company, shall well and truly pay said promissory notes as the same severally become due, together with all interest thereon, and shall well and truly perform all of the other conditions herein, then this instrument shall be void, otherwise to remain in full force and effect. This mortgage is upon the express condition that the same is executed unto Lafayette Perkins as trustee for each and all of the holders and owners of the respective claims aforesaid and to secure the payment of each and all of the aforesaid claims equally and *pro rata* and without any priority as between such holders and owners or any of them, and without reference to the maturity of any of such claims, except the indebtedness to the First National Bank of Chicago, which with the note evidencing the same is to be second and junior to all the other indebtedness hereby secured." After providing that the possession of the mortgaged property upon demand of the trustee shall be surrendered to him by the company, and further providing for a sale of the property by the trustee, the mortgage then stipulates and proceeds as follows: "The proceeds arising from such sales, less all expenses thereof, including rents, salaries, insurance, and other charges and

expenses incurred in the conduct of said business and in the disposition of said property, to be applied to the payment of the indebtedness hereby secured, * * * as hereinabove provided, and if such proceeds shall be more than sufficient for that purpose, the excess, after payment of all costs, charges, expenses, and of all said indebtedness as aforesaid, shall be paid to said mortgagor, the Krag-Reynolds Company." This mortgage was duly acknowledged. At the time of its execution, the notes therein described were executed by the company to the several beneficiaries therein named and heretofore mentioned. The claim of the Eppens, Smith & Weiman Company previous to the time of the execution of the mortgage was held by that company in the form of an open account.

The court further found in respect to the mortgage of December 21st, and the claims therein secured, as follows: "Nicholas McCarty Harrison had already received his note; that all the remainder of said notes save the one to Harrie N. Reynolds were delivered to Mr. Perkins, trustee, to be presented to the respective beneficiaries, and in case of their acceptance under said mortgage to be delivered to them; that Mr. Perkins took the note to Harrie N. Reynolds and delivered it to him, and that thereafter, on the same day, said Harrie N. Reynolds indorsed the same and delivered it, together with his own note for a like amount, to Alfred B. Gates, who thereupon assigned to Harrie N. Reynolds, who delivered and surrendered the same for cancelation to said corporation, the certificate for the preferred stock theretofore held by said Gates. That Nicholas McCarty, both as representing himself and Nicholas McCarty Harrison, was present during the preparation of said mortgage, and at the time of its execution, and at once upon its execution accepted the benefits thereof, both for himself and for Nicholas McCarty Harrison; that at the time of his acceptance thereof he knew that Nicholas McCarty Harrison and Alfred B. Gates had been preferred stockholders in the corporation

of Krag-Reynolds Company, and the consideration upon which the notes to said Harrie N. Reynolds and said Harrison, respectively, had been executed.     *     *     * After execution of said mortgage and the delivery thereof to said Lafayette Perkins as trustee, he, on the 22nd day of December, 1897, made known the fact of its execution to the First National Bank of Chicago, Illinois, and inquired if it desired to accept the same, to which it answered that it did, and did accept the same, and received and accepted said new note, and also retained the notes which it already held, said Perkins consenting thereto.     *     *     * That Mr. Hord, who was a partner in the practice of law with Mr. Perkins, the trustee in said mortgage, at said Perkins' request, carried the note of Eppens, Smith & Weiman Company to the office of said corporation in the city of New York, and there, on December 24, 1897, made known to said corporation the fact of the execution of said note and mortgage, and inquired if it desired to accept the same, and thereupon said corporation did accept the same, and said note was then delivered to said corporation and accepted by it.     *     *     * That at the time of the acceptance of said mortgage by the First National Bank of Chicago, Illinois, the Indiana National Bank of Indianapolis, Indiana, the Capital National Bank of Indianapolis, Indiana, and the Eppens, Smith & Weiman Company, they did not, nor did any of them, have any notice or knowledge that said two notes for $25,000, each described in said mortgage as executed to Harrie N. Reynolds and Nicholas McCarty Harrison, or either of them, were executed to procure the surrender and cancelation of said preferred stock, or that they had any connection whatever with the preferred stock of such corporation". Lafayette Perkins, trustee, was a member of the firm of Hord & Perkins, practicing attorneys in the city of Indianapolis, and he and his said partner were the legal advisers of the Krag-Reynolds Company, and so

continued to be after the execution of the first mortgage. Said trustee at the time of the execution of the mortgage, and at the time he presented the notes secured thereby to each of the said banks for acceptance, knew the consideration of each of the two notes executed for $25,000, for the preferred stock, and secured by the mortgage as heretofore stated, and he also knew at the same time that the company was indebted to persons other than the beneficiaries named in the first mortgage to an amount at least of $75,000, and his partner, or associate, Mr. Hord, when the latter presented the notes to the Eppens, Smith & Weiman Company for its acceptance, had like knowledge of these facts. The first mortgage was filed for record in the recorder's office of Marion county, Indiana, on December 27, 1897. Charles M. Reynolds, the president and chief manager of the Krag-Reynolds Company, as heretofore stated, knew that this company was insolvent at and prior to December 21, 1897. On the same day said attorneys, Hord and Perkins, knew that the assets of the company, as a going concern, would not exceed in value $250,000, and they also knew of liabilities or claims against the company, including the claims of Gates and Harrison for preferred stock, amounting to about $204,000, and these attorneys also knew that the company was financially embarrassed, and that unless it could at once secure outside help it must inevitably fail. They were also aware that if the mortgage of December 21st was placed upon public records that the credit of the company would be destroyed and its failure would necessarily follow. Charles M. Reynolds, it appears, was surety for some of the claims secured by the first mortgage. On December 21, 1897, Charles M. Reynolds, William W. Krag, and William A. Krag owned all of the stock of said company, except a small amount thereof standing in the name of other persons to qualify them to act as directors. William W. and William A. Krag did substantially any and all things as officers and directors of the company which were requested of them by

said Charles M. Reynolds and among other things done on the said 21st day of December, said Krag and Krag, in connection with said Reynolds, ratified the act of the latter in withdrawing from the company $35,000 upon the pretended payment to himself for sums of money claimed to have been advanced by him to the company, when in fact there was nothing due or owing to him from said company. They also at the same time authorized an acceptance by the company of the note of Reynolds for $20,000 due one year from that date, the amount of this note being for an alleged donation by Reynolds to the company.

The special finding further discloses that on December 20, 1897, Hord and Perkins, with the consent of the company's officers, drew from the treasurer of the company $5,200 for alleged services rendered and to be rendered by them for the company. On December 21, 1897, at a meeting of the board of directors, the treasurer of the company was directed to pay to Fred Eppert, the bookkeeper, and to Nicholas McCarty Harrison, Charles M. Reynolds, William W. Krag and William A. Krag, extra salaries theretofore voted to them by the directors of the company on March 10, 1896, the amounts allowed being as follows: Charles M. Reynolds $1,966.66, William A. Krag $1,966.66, William W. Krag $983, Nicholas McCarty Harrison $491.50, Fred Eppert $983. All of these amounts of money were paid from the funds of the company at that time, although according to the resolution adopted March 10, 1896, they were not to be payable until two years from that date. Perkins, trustee, under the mortgage, on December 22, 1897, went from Indianapolis to Chicago for the sole purpose of notifying the First National Bank of that city of the execution of the mortgage, and to deliver to it the new note secured thereby. On arriving at the city of Chicago, at 9 o'clock at night, he drove to the residence of the bank's president, and gave him the information in respect to the execution of the mortgage, and delivered to him the bank's note, and informed him of

the execution of the mortgage, all of which he accepted on behalf of the bank.   Prior to the execution of the mortgage of December 21st, none of the beneficiaries therein named, except Gates, had requested that it be executed ; neither were they pressing the payment of their claims.   All the notes secured by said mortgage were in consideration of an antecedent or previous indebtedness of the company, and appear to have been accepted in the main as collaterals.   On the face of the note executed to Nicholas McCarty was written the following:   "Taken as a collateral security for a note of same amount of date November 22, 1897."   On December 27, 1897, the Krag-Reynolds Company also executed to Lafayette Perkins, as trustee, a second mortgage to secure about twenty-nine more of its creditors other than those secured in the first mortgage.   This latter mortgage covered claims against the company held by the beneficiaries therein named to the amount of $226,229 and over; this mortgage virtually embraced the same property covered by the first, but in addition thereto it included certain real estate belonging to the company situate in Marion county, Indiana.   This mortgage provided that it was executed to Perkins, as trustee, for each and all of the holders and owners of the promissory notes therein mentioned and described, and that the indebtedness evidenced thereby was to be "subject to the mortgage executed by Krag-Reynolds Company to said Lafayette Perkins as trustee, under date of December 21, 1897."   It further provided, among other conditions, that "This mortgage is upon the express condition that the same is executed unto said Lafayette Perkins, as trustee, for each and all holders and owners of the respective claims aforesaid, and to secure the payment of each and all of the aforesaid indebtedness, and first and before and in preference to all others, to secure the payment of said indebtedness evidenced by the aforesaid nine notes to Frank L. Sheldon and Lafayette Perkins, trustees, and second to secure equally and *pro rata* and without any priority as between them or

any of them, and without reference to the maturity of any thereof, all the other indebtedness secured by this mortgage." It also contained other provisions and conditions in respect to the sale by the trustee of the property mortgaged, and also stipulated as follows: "In case it may be deemed advisable that said Lafayette Perkins, as such mortgagee, continue said business for the benefit of the holders and owners of the indebtedness hereby secured, and buy additional goods for such purpose, and the holders and owners of a majority in amount of such indebtedness and the holders and owners of all the indebtedness secured by the mortgage executed by said Krag-Reynolds Company to said Lafayette Perkins as trustee, under date of December 21, 1897, shall so direct the mortgagee hereunder in writing, said mortgagee shall have the right so to do; and in case it may be deemed advisable that the insurance policies upon the life of W. A. Krag, in which said Krag-Reynolds Company is the beneficiary, aggregating in amount $145,000, which are also hereby mortgaged, assigned, pledged, transferred, and set over to said Lafayette Perkins, as trustee, hereunder as additional security for the payment of the indebtedness by this instrument secured, be kept up, and the holders and owners of a majority of the indebtedness hereby secured shall so direct said trustee in writing, he shall have the right to do so." This latter mortgage was accepted by Perkins, the trustee, and recorded on the same day of its execution at 11:30 o'clock a. m. in the recorder's office of Marion county, Indiana. The court finds, however, that Perkins had not communicated the fact of this second mortgage to any of the beneficiaries therein named, nor had any of them any notice of its execution, nor had any of them accepted the benefits thereof until after the execution and recording of the general deed of assignment made by said Krag-Reynolds Company as next hereinafter mentioned. On the same day, to wit, December 27, 1897, said company made a general assignment, under the insolvent laws of this State, to one

Edward L. McKee, for the benefit of all of its creditors, and said deed of assignment was recorded in the recorder's office of Marion county, Indiana, on the same day of its execution at 2 o'clock p. m.   McKee, as trustee thereunder, failed to qualify within the time required by law, and thereafter John Reagan, appellant herein, was appointed by the proper court as trustee, and duly qualified as such.   After eliminating the claims of Harrison from the first mortgage, and including therein the claim of Gates, the amount of the indebtedness remaining secured thereby, including interest and attorney's fees as found by the court, amounted in the aggregate at the time of the trial to $110,465.85.

Counsel for appellant Reagan contend that, under the facts as disclosed by the special finding, the first mortgage of date December 21, 1897, must be held invalid so far as the same concerns appellant as the trustee of all the company's creditors, for the following reasons, among others:   (1) Because said instrument is bottomed upon and owes its existence to the unlawful and fraudulent scheme  adopted to obtain the necessary consent of the preferred stockholders, to wit, by executing the notes of the company to the amount of preferred stock and including them in the mortgage security;   (2) because the mortgage in question was procured by Charles M. Reynolds for the benefit of the beneficiaries therein named, and that hence, by accepting its benefits, they adopted as their own the acts, promises, and conditions made by Reynolds in procuring the company to execute the mortgage.   It is insisted that he thereby became their agent and his acts and knowledge must be imputed to them;   (3) that the mortgage under its conditions, terms, and stipulations is a unit, and all the beneficiaries therein are thereby inseparably joined or united together, and are required to participate in the arrangement to defraud the mortgagors' unsecured creditors.

These propositions in the main are the principal ones presented and discussed by counsel in this case.   We have given

these several questions a careful consideration, and in doing so we have fully considered the arguments of and the authorities cited by the able counsel who appear for the respective parties. To recapitulate: The court's finding reveals the fact that at and prior to the execution of the first mortgage in dispute the Krag-Reynolds Company was grossly insolvent. Its liabilities, at that time, were far in excess of its assets or its ability to pay. Its insolvent condition, at that time, was known to its principal and financial manager, Charles M. Reynolds, and such knowledge, through his agency, must be imputed to the company. In this situation the officers of this company, principally Mr. Reynolds, desired to make a mortgage upon its property to secure the claims of some of its creditors, all of whom, with the exception of two, perhaps, were what may be denominated its "home creditors". The company, it seems, was advised that under the statutes of this State, which provided for and controlled the issuing of its preferred stock, that it could not mortgage its property without the written consent of the holders of the majority of such stock. Alfred B. Gates and Nicholas McCarty Harrison each, it seems, held one-half of this stock, hence it was necessary to obtain the consent of both in order for the company to execute a mortgage valid or effectual in all respects. In this condition of affairs, it appears that its president and financial manager, Mr. Reynolds, consulted with the attorneys and legal advisers of the company in regard to the execution of the mortgage to secure the claims or debts which the company desired to prefer over others. Reynolds, as the facts show, was advised to the effect that the only way open to the consummation of his desire to secure the execution of the mortgage in controversy was either to obtain the written consent of both of the preferred stockholders, or in some manner to get the stock which they held out of the way as an obstacle to the execution of the mortgage. A plan or scheme seems to have been devised by the attorneys of the

company, Messrs. Hord and Perkins, which was accepted and carried out by Reynolds on behalf of the corporation, which was to the effect that the preferred stock was to be taken up by the insolvent concern executing its notes to the holders thereof to the amount of the stock. In order to obtain the consent as required by the statute, negotiations with the two preferred stockholders in question were begun by Reynolds, which resulted in the taking up of their stock by executing to these stockholders, in the place and stead thereof, two promissory notes of $25,000 each, bearing date of November 1, 1897, and in securing said notes under the mortgage of December 21, 1897, thereby, in effect, advancing these stockholders to the position of secured creditors. In pursuance of this scheme new notes were also executed to several of the other beneficiaries named in the mortgage, all of which, along with the notes executed to Harrison and Gates, were included in the mortgage. The form of the mortgage and its conditions, terms, and stipulations were all, as it appears, formally arranged by the company at a meeting of its directors and officers held on December 20, 1897, immediately preceding its execution. We have set forth in the statement of facts what such terms, conditions, and stipulations were, so far as we have deemed the same to be material to the solution of the question or questions involved.

The third contention of counsel for appellant Reagan, heretofore mentioned, is more fully and particularly stated in their brief as follows: "Because by the terms of the mortgage or contract itself, the parties, by accepting it, stipulate and agree to dispose of property of the insolvent corporation to defraud the unsecured creditors; that it was the plain purpose and intent of the parties, as shown by the contract itself, to defraud the unsecured creditors, and that every beneficiary therein named becomes by the terms of the contract a party to the fraud by contracting and agreeing that the preferred stockholders shall be treated as creditors and shall

receive, by virtue of such contract, property of the company, so as to hinder, delay, and defraud creditors."

An act of our legislature, in force since February 28, 1893 (Acts 1893, p. 162), provides for the issuing of shares of preferred stock by any manufacturing or mining incorporated company. The provisions of this act are embraced within §§5064-5069, Burns 1901. Section 4 of this act, being §5067 Burns 1901, provides as follows: "Such preferred stock shall not at any time exceed double the amount of the common stock of such company actually subscribed or issued, and it shall be subject to redemption at par at such time or times, and upon such terms and conditions as shall be expressed in the certificates thereof, and the holders of such preferred stock shall be entitled to receive, and the said company shall be bound to pay thereon such semiannual sum or dividend as may be expressed in the certificates, not exceeding four per centum, before any dividend shall be set aside or paid on the common stock of such company, and in no event shall the holders of such preferred stock be individually or personally liable for the debts, or other liabilities of such company, but in case of insolvency, or upon the dissolution of such company, such debts or other liabilities, shall be paid in preference to such preferred stock. Such preferred stock, however, shall at all times have priority in payment out of the assets of such company over the common stock thereof, for the full face value, together with all arrearages of interest or dividends due thereon."

Section 5, being §5068 Burns 1901, reads as follows: "Such preferred stock shall not be voted at any meeting of such company, nor shall the holders thereof, as such, have any voice in the management of the affairs of such company, excepting, however, that such company shall not have authority to convey its real estate or mortgage any of its property without the written consent of the holders of a majority of the shares of such preferred stock; nor shall such company without such consent declare any dividend upon its common

stock that will impair its capital. Such preferred stock shall not entitle the holders thereof to any interest in the assets of such company beyond the par or face value of such preferred stock, together with all arrearages of interest or dividends due thereon."

It will be readily seen by the express provisions of §5067, *supra,* that the holders of such preferred stock are in no event to be personally liable for the debts or liabilities of the company. In case, however, of the company's insolvency, or upon its dissolution, the statute commands that the debts or other liabilities of such company shall be paid in preference to such stock. Or, in other words, when such company has either become insolvent or has been dissolved, the effect of this provision of the law is to give the creditors of the company an absolute and unqualified preference in the payment of their claim over the payment of the preferred stock. By the above §5068, *supra,* it is provided that such company "shall not have authority to convey its real estate or mortgage any of its property without the written consent of the holders of a majority of the shares of such preferred stock". When the company was confronted with the provisions of the statute above mentioned, which denied its authority to execute a binding and effectual mortgage as against its two preferred stockholders, without their consent, it seems that some log-rolling, or maneuvering, was resorted to in order to obtain the surrender of the preferred stock and thereby remove it as an obstacle in the way of making the mortgage for the purpose desired. The scheme originated, as the facts disclose, was to substitute the company's notes for the total amount of the preferred stock certificates. Gates, the holder of one of these certificates, appears to have held the key to the situation which confronted the promoters of the scheme to get the preferred stock out of the way of the contemplated mortgage. He being in a position to dictate terms, it appears, declined to accept the note of the company for his share of stock, un-

less the same was secured. It appears, then, that in order to satisfy him and obtain his consent to the execution of the mortgage in question, the insolvent company decided to embrace therein as a preferred claim, not only the stock note which was to be executed to Gates, but also the note given to Harrison for the surrender of his stock. This decision of the company was consummated and carried into effect under the mortgage in controversy, and thereby an attempt was made to confer upon these two stockholders rights and preferences by this insolvent corporation over its unsecured creditors, which the law denied; not only were they by the provisions of this instrument advanced and preferred over the unsecured creditors, but also over the claim of the First National Bank of Chicago, one of the co-beneficiaries. The statute in question denied the right of the Krag-Reynolds Company in its insolvent condition to advance its two preferred stockholders in the manner which it did to the position of secured creditors, thus preferring their claims over those of its unsecured creditors without the consent of the latter; hence the act of the company, under the circumstances, in so doing, was a transgression of the law. By this action of the insolvent company, these stockholders were awarded an undue preference or an advantage over its *bona fide* unsecured creditors. This preference was an evasion of the statute in question, and operated as a fraud upon the rights of such creditors.

It is argued by counsel for appellees that the officials of the company honestly believed that it had the right to secure, under the mortgage, the claims of Gates and Harrison, and therefore ought not to be considered guilty of or intending to perpetrate a fraud upon the rights of its unsecured creditors. We are not impressed with this contention. It is certainly true that "Where there is no law, there is no transgression"; but it is equally true that where the law exists and the transgression or violation thereof is admitted, the intent of the transgressor follows as a legal inference or con-

clusion. It is true that in this State fraud is a question of fact, and not one of law, but where the act of a person necessarily operates to defraud creditors, or results as a fraud in and upon their rights, the actor will be presumed to have intended the fraud which resulted. *Personette* v. *Cronkhite,* 140 Ind. 586; *Anderson* v. *Etter,* 102 Ind. 115; *Russell* v. *Winne,* 37 N. Y. 591, 97 Am. Dec. 755; *Hilliard* v. *Cagle,* 46 Miss. 309; *Coleman* v. *Burr,* 93 N. Y. 17, 45 Am. Rep. 160; *Roberts* v. *Vietor,* 130 N. Y. 585, 29 N. E., 1025.

The rule is elementary that every person is presumed to intend the natural or probable consequences of his own acts, and when a fraud is shown the court will attribute to it its legal consequences, or, in other words, where the conduct of a debtor necessarily results in defrauding his creditors, he is presumed to have foreseen and intended such results. *Anderson* v. *Etter,* 102 Ind. 115; Wait on Fraud. Conv. (3rd ed.) p. 19.

In *Coleman* v. *Burr, supra,* an action was brought to set aside certain deeds upon the grounds that they were made with the intent to hinder, delay, and defraud the creditors of the grantor. In the course of the opinion in that case, Earl, Judge, speaking for the court, said: "The statute (2 R. S. 137 §4) provides that the question of fraudulent intent in cases of this character 'shall be deemed a question of fact and not of law'; and the claim is made that here there is no finding by the referee of a fraudulent intent; but that on the contrary he has found the whole transaction to be fair and honest. He has, however, found facts from which the inference of fraud is inevitable, and although he has characterized the transactions as honest and fair, that does not make them innocent nor change their essential character in the eye of the law. Mr. Burr must be deemed to have intended the natural and inevitable consequences of his acts, and that was to hinder, delay and defraud his creditors. Bump on Fraud. Conv. (3rd ed.), 22, 24, 272, 278; *Cun-*

*ningham* v. *Freeborn,* 11 Wend. 241; *Edgell* v. *Hart,* 9 N.
Y. 213, 59 Am. Dec. 359; *Ford* v. *Williams,* 24 N. Y. 359;
*Babcock* v. *Eckler,* 24 N. Y. 623-632."

When tested by the statute in question, the legitimate
creditors of this corporation, when it became insolvent, were
given an absolute preference in the payment of their claims
over the preferred stockholders, but by the terms, conditions,
and stipulations of the mortgage, these stock claims, it seems,
as a matter of contract, were by the company preferred, in
defiance of the law, over the claims of all of its unsecured
creditors, and also over the claim of one of the beneficiaries
named in the mortgage. By the express terms of the instru-
ment, the notes of Gates and Harrison, in respect to their
payment, were placed on an equality with certain benefi-
ciaries therein named, and were to share *pro rata* in payment
out of the proceeds of the mortgaged property, along with
the claims of the other beneficiaries therein, except that of
the First National Bank of Chicago. By the terms of the
mortgage the claims of the latter were made secondary to the
notes of Gates and Harrison. It appears that the company,
by including the claim of Gates in the mortgage, was thereby
enabled to satisfy him and to induce him to yield his con-
sent to its execution. The mortgage, at least so far as it
concerns Gates and Harrison, must be regarded as fraudu-
lent in the sense that it secures claims which the mortgagor
was prohibited by law from embracing therein. It operated
to defraud the unsecured creditors of the company, and con-
sequently was obnoxious to the statute of frauds. §6645
Burns 1901, §4920 Horner 1897. As a question of law then,
upon the facts and circumstances disclosed, the act of the
company in securing the payment of the notes of Gates and
Harrison, as provided by the mortgage, to the prejudice of
the rights under the law of its unsecured creditors, can not
be upheld, but must be condemned as violative of law. The
effect of the company's act in transferring its property to
Perkins, as trustee, by the mortgage in controversy, was to

withdraw it from the reach of its unsecured creditors, and thereby, under its provisions, to invest Gates and Harrison with rights in and to such property and the proceeds thereof which, as we have seen, under the circumstances, the law denied. We conclude, for the reasons stated, that the mortgage of December 21st, so far at least as Gates and Harrison are concerned therein, is invalid as against appellant Reagan, the trustee who stands in this action as the representative of the creditors of the insolvent concern.

We next turn to a consideration of the insistence of counsel for appellant, that this mortgage must be regarded as a unit, and that therefore, under and by force of its conditions and stipulations, the beneficiaries therein by contract are coupled or united together. Or in other words, that all by the contract into which they have entered under the mortgage have agreed that the claims of Gates and Harrison, their co-beneficiaries, shall be paid as therein directed, and are consequently united with said beneficiaries in upholding the fraudulent claims of the latter; that under the contract they will not be allowed to dispute or contest these claims. It is therefore insisted that if the instrument is invalid in part as held by the trial court, it must be deemed to be invalid as an entirety. The contention more specifically is that all of the beneficiaries, by their contract, under the terms and stipulations of the mortgage, have fixed their relations and obligations to each other; that by its terms they have so coupled or joined themselves together that they can not be permitted to sever or assail the claims of Gates and Harrison upon the grounds of fraud or otherwise. It is asserted that the Indiana National Bank has no more right, under the terms of this mortgage, to object to the payment of these claims, as directed in the mortgage, than have the beneficiaries under the second mortgage of December 27th, which was made subject to the first mortgage of December 21st, to attack the claims secured by the latter on the ground of fraud. The mortgage in question upon its face professes

and declares that it is executed upon certain express conditions as follows: "This mortgage is upon the express condition that the same is executed unto Lafayette Perkins, as trustee, for each and all of the holders of the respective claims, and to secure the payment of each and all of the aforesaid claims, equally and *pro rata* and without any priority as between such holders and owners without reference to the maturity of any such claims, except the indebtedness to the said First National Bank of Chicago, which with the note evidencing the same is to be second and junior to all of the other indebtedness secured hereby." The mortgage, as it appears, further directed that the proceeds arising from the sale of the mortgaged property should be applied to the payment of the indebtedness thereby secured, as therein provided.

The mortgagor, the Krag-Reynolds Company, was the owner of the property transferred or mortgaged to Perkins, as trustee, and it certainly was under no legal obligation to execute this mortgage to secure its antecedent indebtedness. The execution of the instrument on the part of the company, under the circumstances, was simply a matter of favor, hence, as a matter of its own choice, it could impose or provide therein such conditions or directions for the disposal of the mortgaged property and the application of the proceeds thereof as it desired. This, so far as the beneficiaries therein were concerned, it certainly had the right to do. That it had the right to tender this mortgage to the several beneficiaries or mortgagees in question, with all of its express terms and stipulations for their acceptance, must certainly be conceded, but the beneficiaries were under no legal obligations to accept it. They could either accept or decline. Perkins, as trustee, therein named, accepted the trust as provided, and each of the beneficiaries as shown accepted the mortgage, and in this action they are claiming under it and are seeking to avail themselves, as against appellant Reagan, of all of its benefits. This mortgage is the

source from which Perkins, as trustee, and the beneficiaries therein, claim and derive all of their rights and powers, and the directions given or stipulated in the instrument must be followed so far as these parties are concerned until set aside according to law. *In re Lewis,* 81 N. Y. 421; *Roberts* v. *Vietor,* 130 N. Y. 585, 29 N. E. 1025; Perry on Trusts §597, §602g. In the latter section the author says: "The powers of trustees under deeds of trust, and of mortgagees under mortgages with power of sale, depend entirely upon the terms of the deeds. Such powers are created by, and exist in the deeds, and of course they exist in the terms in which they are created, and in no others. They are to be exercised by the trustees *in pais.* They are wholly matters of convention and contract between the parties, and not of law or jurisdiction. They can be exercised because they are conferred by one party upon another and not because the law or the courts have conferred or authorized them." It follows, therefore, that the courts can not direct Perkins, as the trustee, to pay a debt of the mortgagor or give it preference in violation of the terms and conditions of the mortgage, and the rights of the beneficiaries thereunder. As was said by the court *In re Lewis, supra:* "To hold the contrary would be to put the court in the place of the assignor and assert a right to modify the terms of the assignment, after it had taken effect, against the will of its maker, and to the injury of those protected by it." See, also, *Chapin* v. *Thompson,* 89 N. Y. 270; Bishop on Ins. Debtors, §359; *Jessup* v. *Hulse,* 21 N. Y. 168; Wait on Fraud. Conv. (3rd ed.), §316.

Where a debtor voluntarily assigns or transfers his property for the security of his creditors, if the latter choose to accept the benefits of such assignment, they must abide by the provisions and conditions imposed. They must accept its provisions as an entirety. They will not be permitted to accept it in part and repudiate it in part. Burrill on Assignments (3rd ed.), §479, and (6th ed.), §429; *Alliance, etc.,*

*Co.* v. *Eaton,* 86 Tex. 401, 25 S. W. 614, 24 L. R. A. 36; *In re Lewis,* 81 N. Y. 421; *Roberts* v. *Vietor,* 130 N. Y. 585.

What we have here said, in regard to the effect of an acceptance upon the part of creditors of an assignment or mortgage made by a debtor for their benefit or security, has no reference to an assignment made in pursuance of our insolvent laws, where all of the debtor's property, by virtue of such statutory assignments, passes under the control or administration of the court.

The beneficiaries, as we have previously said, all accepted this mortgage as security. None, except Harrison, has disclaimed or renounced his interests or rights therein. But all, with the full knowledge of the grounds of attack made and presented by the cross-complaint of Reagan, trustee, in respect to the invalidity of the instrument, are seeking to avail themselves of its benefits. That by its acceptance they have become bound as matter of contract by its terms and stipulations, and therefore are not in a position to assail the claims of Gates or Harrison upon the ground of fraud or otherwise, is fully settled by the decisions of this court.

In the appeal of the *Muncie Nat. Bank* v. *Brown,* 112 Ind. 474, 482, the mortgage in that case, executed in favor of the bank and by it accepted, expressly stipulated that it was to be "second and subsequent" to a prior mortgage executed by the mortgagor to Brown and Jenners to secure certain described indebtedness. The bank, in the lower court, was denied the right to assail the mortgage of Brown and Jenners as fraudulent. On appeal to this court this ruling was affirmed. In the opinion, by Elliott, J., the court said: "The Muncie National Bank is not in a situation to complain of this ruling, for in the mortgage which it accepted that executed to the appellee is recognized as valid. It is recited in the former mortgage that 'it is expressly stipulated herein that this mortgage is made second and subsequent to that of one executed to Cornelia A. Brown and John C.

Jenners to secure the payment of certain of the indebtedness of the said Francis M. Brown to them and each of them as described in said mortgage.' Having treated the mortgage as a valid one, the bank can not be allowed to assail it on the ground that it was made with the intent to defraud creditors." *Barr* v. *Hatch,* 3 Ohio 527; *Irwin* v. *Longsworth,* 20 Ohio 581; Bump on Fraud. Conv., 465.

In the case of *Anderson* v. *Oskamp,* 10 Ind. App. 166, that court held that where a person accepts a chattel mortgage wherein it is stipulated that it is "second and subsequent" to a prior mortgage covering the same property, he will not be allowed to assail such prior mortgage on the ground that it is fraudulent. In the course of the opinion in that case, the court said: "We are unable to see any great inequity in the enforcement of the rule which holds appellees bound by the provisions of the instrument under which they assert their rights. They are not claiming here their right as creditors merely to subject the property fraudulently conveyed to the payment of their debt by the ordinary process of the law, but they assert a contract right, claiming under the mortgage, and superior to the position of creditors standing on their rights as creditors. By this contract right they sought and obtained a preference over all the other unsecured creditors. If they are not permitted to dispute the validity of the first mortgage, they are deprived of nothing which they expect to obtain. Their mortgage only purports to give them a lien second to appellant's mortgage. They received exactly what they contracted for. Their debtor offered them certain security. They accepted it, thus obtaining a preference over the other creditors."

In the case of *Old Nat. Bank* v. *Heckman,* 148 Ind. 490, the bank had accepted a mortgage executed to it by the Indiana Pottery Company. This latter mortgage provided and stipulated that it was subject to the provisions of a prior mortgage executed to one Rosine Heckman and others to secure certain indebtedness. The question arose in that

case as to the effect of these provisions in respect to the prior mortgage and in what regard and in what manner the second or junior mortgagee was bound thereby. This court held that the junior mortgagee, under the circumstances, could not attack the prior mortgage as fraudulent unless he abandoned his rights under his mortgage. In the course of the opinion by McCabe, Judge, this court said: "It is no injustice and no hardship to limit such a person to the express terms of the contract upon which he sues. It is no answer to this position for him to say as the appellant bank did in the case now before us, that had he known that the first mortgage was fraudulent and void as against creditors, he would not have accepted the second mortgage with the stipulation that it was to be subject to such first mortgage. The refusal so to accept would not have bettered the condition of the person so refusing. The mortgagor was not bound to execute any mortgage whatever. It takes two contracting parties to make that contract, the same as any other. If the mortgagor could not obtain the terms to be inserted in the contract of mortgage which he demanded, he had a right to decline to enter into it, the same as the mortgagee had a right to decline to receive it if its terms did not suit him. But it may be said that as appellant bank was ignorant of the fraud in the first mortgage when it accepted the second with the stipulation mentioned therein, it ought to be allowed in foreclosing its own mortgage to show such fraud to the overthrow of the first mortgage, because it is axiomatic that fraud vitiates and paralyzes everything it permeates. That would be true in any proper proceeding to avoid or set aside any contract or mortgage for fraud. But the appellant bank was not seeking to set aside its own mortgage for fraud or anything else. It was seeking, so long as the first paragraph of its cross-complaint remained undismissed, to enforce its mortgage by foreclosing it. But that is not all it was seeking to do; it was seeking to enlarge the terms and conditions of its own mortgage contract by proving fraud

against the first mortgage.  Fraud may furnish means to avoid one contract, but not to enlarge the terms of another, which would amount to the court making a new contract for the parties which they never made for themselves.    *    *    *   Thus it will be seen that the cases involving the question now under consideration do not rest upon the doctrine of estoppel in a strict legal or technical sense, though some of the authorities referred to say that the second mortgagee is estopped to deny the validity of the first mortgage.  But it is apparent that they all rest upon the principle that a party seeking to enforce a contract in his favor must be bound and limited in his relief thereunder to the terms and stipulations of the contract."

These decisions of our own courts fully affirm and sustain the contention that the stipulations and conditions in the mortgage in dispute are contractual and that each and all the parties who accepted it and are claiming benefits and rights thereunder are bound by and must abide by its terms; that they can not enforce it or enlarge their rights thereunder by procuring some of the claims secured thereby to be eliminated therefrom for the reason that they are fraudulent, without violating the express terms and conditions therein imposed by the mortgagor and assented to by the mortgagees, which stipulations and terms provide that the claims therein secured should be paid out of the mortgage fund in the order as directed by the mortgage.  If the stipulations, conditions, and terms of this mortgage are binding upon and can not be disputed by the beneficiaries, for the reason that they are a part of the contract, it would seem that the reasonable effect of this contract between the mortgagor and the beneficiaries, as well as among each other, under its terms, would be that the claims of Gates and Harrison should be preferred and paid, as provided, out of the proceeds of the mortgaged property of the insolvent company, to the prejudice of the rights of its unsecured creditors.

In some of our sister states, a voluntary assignment for

the benefit of creditors, containing preferences, is upheld. Such assignments, in their effect and operation, to an extent at least, are similar to the trust mortgage herein involved. In enforcing these instruments of assignments, the same rule asserted by this court in the decisions cited in regard to mortgages is recognized, and it is held that the parties must be controlled thereby, and that the instrument of assignment must be enforced, if at all, according to its terms and conditions, and that the court can not be put in the place of the assignor and assert a right to modify the terms and provisions of the assignment against the will of the assignor, and to the injury of those protected by its provisions. See Wait on Fraud. Conv. (3rd ed.), §316.

*Jessup* v. *Hulse,* 21 N. Y. 168, was an action to set aside a conveyance of real estate arising out of an alleged fraudulent assignment by one Hulse to Gott in trust for the benefit of creditors. The court in considering the effect of the provisions of the assignment said: "The assignor, being the absolute owner of the property, and in no manner obliged to assign, may annex such conditions and qualifications to the transfer as he pleases. If he annex an improper condition, the court must pronounce the assignment itself void. It can not hold the transfer good, and disregard the condition; because that would be to take the property from the assignor against his will. He having consented to part with his title only upon certain conditions, the transfer and the conditions must stand or fall together. If, therefore, the court upholds the assignment, it must of necessity protect and enforce the terms and conditions upon which it is made. It can not substitute its own discretion for that with which the assignor has in express terms invested the assignee."

In the appeal of *Brigham* v. *Tillinghast,* 13 N. Y. 215, in speaking of trusts created by such assignments, the court said: "By our laws trusts may be created to sell property for the payment of debts. But these trusts, when created and declared, must be capable of being executed in the man-

. ner specified in the instrument creating them without contravening any statute or settled principle of the common law."

The general force or trend of the authorities is that under a common law assignment in trust for the benefit of creditors, it is the duty of the assignee to uphold his trust, not to impeach it, and he can not object to the payment of the claim of a creditor preferred in the deed of assignment upon the ground that such preferred claim is fraudulent. *Roberts* v. *Vietor,* 130 N. Y. 585, and cases there cited.   .

In Bishop on Ins. Debtors (3rd ed.), §419, the author states the rule as follows: "If the assignee is directed to pay certain persons upon certain specified amounts, either with priorities or proportionately, the assignee who accepts the trust, and all the creditors who come in and share under it, are bound by the provisions of the deed and can not dispute them. This proposition, which rests on the doctrine of election, that he who accepts a benefit under an instrument can not dispute the validity of its provisions, is abundantly sustained by the authorities.   *   *   *   If the claims so provided for are fictitious or fraudulent or such as for any reason ought not to be paid, that will be a ground for setting the assignment aside as fraudulent and void, but it will not furnish a ground upon which a creditor claiming under the assignment as a valid instrument can dispute the claim of another creditor provided for in the same manner in the same instrument."

The decisions of this court also fully recognize and affirm the rule asserted by the preceding authorities in regard to assignments at common law. In *Seibert* v. *Milligan,* 110 Ind. 106, the question in respect to the validity of the statutory assignment therein involved and its effect in carrying into the trust property of the assignor which he had omitted, or had previously fraudulently conveyed, was considered. In the opinion in that case, Mitchell, J., said: "The distinction between an assignment under the act regulating

voluntary assignments, and an assignment at common law, · is to be steadily kept in view. At common law a debtor might assign the whole or any part of his property, for the benefit of all or a part of his creditors. In such an assignment the relations of the parties were created and controlled entirely by contract. The assignee had no power except such as the contract conferred upon him. He stood in the place of the assignor, in respect to all property fraudulently conveyed, and could assert no claim to such property, which the latter could not himself have asserted. Only such property as was described in the deed passed to the assignee in such a case, and property fraudulently conveyed was not affected by such an assignment."

The authorities seem fully to sustain the proposition that if a common law assignment is fraudulent in part, the whole instrument is thereby vitiated and rendered void. *Caldwell* v. *Williams,* 1 Ind. 405; *Roberts* v. *Vietor,* 130 N. Y. 585; *Mackie* v. *Cairns,* 5 Cow. 547, 15 Am. Dec. 477; *Grover* v. *Wakeman,* 11 Wend. 187-225, 25 Am. Dec. 624; *Simons* v. *Goldbach,* 56 Hun 204, 9 N. Y. Supp. 359; *Russell* v. *Winne,* 37 N. Y. 591, 97 Am. Dec. 755.

In *Caldwell* v. *Williams,* 1 Ind. 405, the question arose in respect to a fraudulent common law assignment for the benefit of creditors. The contention in that case was that although the assignment was fraudulent as to the assignor and assignees still if the creditors, the *cestui que trust* for whose benefit the assignment was made, were not parties to the fraud, the assignment should stand for the benefit of such innocent creditors. This contention the court denied, and in the course of its opinion said: "The contract of assignment is between the assignor and assignees. The creditors generally are parties to it, if at all, by subsequent assent, expressed or implied. That assent was given to the contract, such as it was, between the assignor and assignees, with full opportunity, in this case, on the part of creditors to observe the character of the assignees, and the ap-

parent suspicious nature of the transaction; and if that contract was fraudulent, the assent of the creditors under such circumstances has not purged it of the fraud even as to them. But aside from this, in the present case, the assignees are also among the largest creditors provided for in the assignment. This being the case, the assignment is fraudulent as to two, at least, of the creditors, as well as to the assignees, as we have already held; and, being general of all the property for the payment of all the named debts, and not of separate parts of the property for the payment of specified debts, the fraud pervades the whole assignment, and must, at least as to the personal property, vitiate the whole; for how can we separate the good from the evil? * * * Again, it is a general doctrine that a deed void in part for fraud is void *in toto.*"

In *Russell* v. *Winne,* 37 N. Y. 591, it was contended that if the chattel mortgage involved in that case was fraudulent as to part of the property therein embraced, that the instrument was thereby rendered fraudulent as to the entire property mortgaged. This contention was sustained by the court of appeals and in the course of the opinion it is said: "The mortgage was one single instrument, given to secure one debt. To render it valid, it must have been given in good faith, and for the honest purpose of securing the debt, and without any intent to hinder or defraud creditors. This can not be true when the object, in part, or as to part of the property, is to defraud creditors. This unlawful design vitiates the entire instrument. The unlawful design of the parties can not be confined to one particular parcel of the property. Entire honesty and good faith is necessary to render it valid; and whenever it indisputably appears that one object was to defraud creditors, to any extent, the entire instrument is, in judgment of law, void. It is not at all analogous to a class of cases where it has been held that a part of an instrument, of itself valid, and not dependent

upon other parts which are invalid, may be enforced. Here the fraudulent design, if it existed, destroys the foundation of the entire instrument."

It is perhaps needless to cite further authorities to sustain the doctrine so universally asserted, that any mortgage or conveyance which is fraudulent as to part of the property transferred, or which, if made to depend upon a consideration partly fraudulent, is thereby rendered void as an entirety against the creditors of the grantor, unless such contract is in its character or nature so framed that the illegal part may be separated and eliminated from that which is legal. *Consumers Oil Co.* v. *Nunnemaker,* 142 Ind. 560-568, 51 Am. St. 193, and cases there cited. The following additional authorities in respect to this proposition may be consulted: 6 Am. & Eng. Ency. of Law (2nd ed.), 757; 9 Am. & Eng. Ency. of Law (1st ed.), 881, 882, 883; *Widoe* v. *Webb,* 20 Ohio St. 431, 5 Am. Rep. 664; *Jaffray* v. *Wolf,* 4 Okla. 303, 47 Pac. 496; *Everhardt* v. *Puckett,* 73 Ind. 409; *James* v. *Jellison,* 94 Ind. 292, 48 Am. Rep. 151; *Adams* v. *Niemann,* 46 Mich. 135, 8 N. W. 719; *More* v. *Bonnet,* 40 Cal. 251, 6 Am. Rep. 621.

It is insisted by counsel for appellee that the fraudulent parts of the mortgage in question may, under the rule stated, be separated from the parts which are legal, and that therefore the instrument can be sustained, so far as it secures the honest claims therein included. It is true that where a mortgage or deed is executed to secure the claims of several creditors, that an honest creditor does not necessarily lose his security because the instrument providing the security embraces fraudulent claims, provided the latter claims are distinct and separable from the honest and valid claims therein secured. This doctrine is generally asserted and approved by the authorities and is recognized by the decisions of this court. See *Morgan* v. *Worden,* 145 Ind. 600. But, as said by the court in the case last cited, "If the claims and actions of the mortgagees were not distinct and divisi-

ble quite another question would confront us." Neither can it be disputed, as contended by counsel for appellee, that a creditor has the right to accept security for a debt justly due him. It is equally true that an insolvent corporation has the right to prefer one or more of its *bona fide* creditors over its other creditors. If the mortgage in this case simply professed to secure the just claims of the other beneficiaries along with those of the two preferred stockholders, without fixing the priority of such latter claims, or directing the order in which they should be paid, thereby making the mortgage to depend upon these express terms and conditions, quite a different question would be presented. But as previously asserted, no beneficiary or mortgagee of the mortgage in controversy, by reason of the force of his contractual relation to his co-beneficiaries, under its express terms and conditions, will be permitted to assail or repudiate, on the ground of fraud or otherwise, any of the claims of his co-beneficiaries. It is certainly true that one of the features of a mortgage, severable or separable in its parts, is that any one of the mortgagees therein may be allowed to contest the validity of any other claim therein secured, without violating any of the terms or conditions by which he is bound under the mortgage. Such a mortgagee or beneficiary would have the same rights and occupy the same position in this respect as though his claim was secured by a separate mortgage executed to himself alone, including no other claim than his own, and which made no reference or imposed no terms or conditions in respect to some other mortgage embracing the same property. If separate mortgages had been executed by this insolvent company to each one of the beneficiaries in question, and if each of these separate mortgages had provided and stipulated in like manner as the mortgage in controversy, to the effect that the claims of Gates and Harrison should stand on an equal footing and share *pro rata* with the claims of the other beneficiaries, except the claims of the First National Bank of Chicago, which were made second-

ary, then, under such circumstances, those who held just or valid claims would certainly not occupy any better or different positions than they now do under the mortgage in dispute. The legal effect, under such circumstances, of the terms and conditions imposed in each separate mortgage, would be the same as it is under the terms and stipulations of the instrument involved. It is true that Harrison, before the trial, surrendered or quitclaimed his interest in and to the mortgage in question, still, so far as the questions involved in this case are concerned, his claim may be regarded and treated as though such action had not been taken on his part. By the decision of the trial court, the mortgage, in so far as it secured the claims of the preferred stockholders, was so modified or changed as to eliminate these claims from the security. It is evident that thereby the beneficiaries, other than the Chicago bank, were relieved of the burden of the mortgage which they had assumed, to the effect that the claims of Gates and Harrison should stand on an equal footing with their own. The Chicago bank was relieved of the burden or condition to the effect that these claims should be preferred in payment over its own. It is certainly manifest that in the event the proceeds of the mortgaged property should, for any cause, prove insufficient to pay in full all of the claims included by the mortgagor, the action of the court in eliminating these claims from the mortgage security, to the amount of $50,000 and over, would greatly inure to the benefit of the other beneficiaries. The holding of the court, under such circumstances, would enlarge their rights from what they were under the mortgage which they accepted. This would be the result although contrary to the express terms and conditions of the instrument. The Krag-Reynolds Company, as the mortgagor, it appears, consented to convey its property to Perkins, as trustee, upon certain express terms and conditions. These terms and conditions were intended by the company when it executed the instrument, and by the beneficiaries when they accepted its benefits, to

operate and be enforced as a whole, and not in part. Consequently the mortgage, as constituted, under its express provisions and conditions, can not be modified or annulled in part, and upheld in part, without contravening the intention of the parties. The beneficiaries by accepting the benefits of the mortgage and asserting their rights thereto certainly must be considered as having concurred in its intent or purpose, which, as we have said, was to secure and pay all of the claims therein embraced in the manner and order stipulated. By accepting the provisions of the instrument, all of its terms and conditions constituted a binding written contract between the parties, precisely the same as if it had been signed by each of them. *Midland R. Co.* v. *Fisher,* 125 Ind. 19, 8 L. R. A. 604, 21 Am. St. 189; *Indianapolis Nat. Gas Co.* v. *Kibbey,* 135 Ind. 357.

The facts disclose that when the execution of the mortgage was first contemplated, it was not the intention of the company to include therein the claims of Gates and Harrison. Gates, as heretofore stated, it seems, held the key to the situation and was in a position to dictate terms. He declined to accept a note for his stock unless it was secured. No effectual or binding mortgage, by reason of the terms of the statute, could be made in favor of the home creditors, or any others, without obtaining the consent of Gates. His consent to the mortgage appears to have been purchased by the company on the condition or upon the consideration that his claim should be embraced in the security, and paid in the order as therein provided. The directors and stockholders of the insolvent company held a meeting and agreed to the frame of the instrument as it was finally executed and accepted. The mortgage in question, under its conditions, when viewed in the light and circumstances leading up to its execution, must be considered as impressed with the illegal agreement between the company and Gates by which his consent was obtained. The company at the time of its agreement with him, and at the time it executed the mort-

gage, and at the time it was accepted by the beneficiaries was, as shown, grossly insolvent. It was certainly bound to take notice of its insolvent condition, and, as previously said, the knowledge of Reynolds, its president and financial manager, in regard to such conditions, must be imputed to the corporation. In that condition it was chargeable with notice that a positive statute, by which it was governed, fixed the rights of its creditors, and made their rights superior to those of its preferred stockholders in respect to the payment of their claim. By reason of the force and effect of this law, any agreement or contract of the company, when insolvent, by mortgage or otherwise, without the consent of its creditors, which in its provisions would be at variance with or antagonistic to their preferred rights under the statute, would be in defiance of law, and therefore could not be sustained. If the court in this case carries out or enforces the mortgage contract in question according to its intent and purpose as expressed by its terms and conditions, its action or decision in so doing will be contrary to law and will permit the mortgage to operate as a fraud upon the unsecured creditors. Again, if the mortgage contract is upheld in part, and annulled in part, the action of the court will be contrary to the intent of the instrument, as fixed by its contractual terms and conditions, to which all of the beneficiaries have assented and agreed to be bound, and such action of the court will virtually result in enforcing a contract entirely different from the one into which the parties entered. When confronted with this state of affairs, what, under the law, is the duty of the court? It can not, as the authorities affirm, put itself in the place of the mortgagor and assert a right to modify the terms of the instrument against the will of its maker and against the will of those benefited and protected thereby. The only consistent thing that a court can do, under such circumstances, where the illegal contract is inseverable, is to declare it to be invalid as a whole, and leave the parties in the condi-

tion they were before its execution. While it is true that the claims of the beneficiaries, other than Gates and Harrison, may be considered as valid and might have been preferred by the company although insolvent, nevertheless, the instrument, as we have seen, in which they are included, was executed upon the express conditions and stipulations that the claims of Gates and Harrison should be paid as provided or directed. The payment of these latter claims out of the proceeds of the mortgaged property, under the peculiar scope, terms, and conditions of the mortgage, is so connected with the payment of the valid claims as to be inseparably united. Or in other words, the legal and illegal parts of this contract, under its terms and conditions, are so mingled, interwoven, and united with each other, that they can not be separated, so that the illegal part may be avoided, and the legal portion sustained. As the contract is tainted and vitiated in part, and being inseparable, for the reasons stated, a court can not rescue the part which is good from that which is evil, and enforce the former without defeating the intent and terms of the contract. Under such circumstances the rule or maxim of the law which asserts "void in part, void *in toto*" applies, and the contract must be held invalid in its entirety. The decision of *Henderson* v. *Pierce,* 108 Ind. 462, where the court eliminated the preferences made in the deed of assignment, but otherwise sustained it, as a general statutory assignment, is distinguishable from the case at bar, and has no application to the question as here involved. The insolvent debtor in that case honestly intended, it seems, to make a general assignment in pursuance of our insolvent laws for the benefit of all of his creditors, and intended that such assignment should be operative in accordance with the statute pertaining thereto. The court in that case so treated the assignment and gave effect to the intent of the assignor. The valid claims held by the beneficiaries, other than Gates and Harrison, were debts of the company contracted pre-

viously to the execution of the instrument. These bene-
ficiaries by accepting the mortgage security surrendered
nothing, for it, at least so far as they were concerned, was
executed upon a past consideration. The new notes ex-
ecuted by the company to these beneficiaries and secured by
the mortgage were, as it seems, accepted by them merely as
collaterals; hence, if they are deprived of their security,
they will certainly be in as good a condition as they were
before they accepted it. They voluntarily placed them-
selves in the position which they now occupy, by accepting
a mortgage which by its terms and stipulations inseparably
united and connected their claims with the fraudulent
claims of Gates and Harrison. They can not be permitted
to deal at arm's length with this insolvent company, and
then, when confronted with the attitude in which they have
placed themselves, seek to be relieved on the ground that
they did not know what the character or scope of the con-
tract was into which they entered. They were bound to
know at their peril when they accepted the mortgage what
its terms and conditions were, and they can not now be ex-
empted from the results thereof because they may have had
no actual knowledge of the import and effect of such terms
and provisions. But it is insisted that they had no knowl-
edge of the insolvency of the company at the time they ac-
cepted the mortgage, but believed it to be solvent; that they
did not know that Gates and Harrison were preferred stock-
holders, and that their stock claims were included in the
security, hence it is claimed they can not be considered as
agreeing to or participating in the fraud upon the unsecured
creditors that may result from the operation of the mort-
gage. There are no conditions or limitations in the statute
in question, whereby its mandate forbidding the preference
of the company's stockholders over its creditors when in-
solvent, which require the operation of that law to depend
upon the notice of such insolvency. The company, as pre-
viously stated, was bound to take knowledge of its insolvent

*status,* and to know that when in that condition the law stripped it of the right to prefer these stock claims in payment over the claims of its creditors. The terms and provisions of the mortgage at the time it was executed were open to the inspection of the beneficiaries had they desired to learn their import and effect. If they accepted the favor which the company by its mortgage extended to them, without knowing the character or nature of its terms and stipulations in which they were concurring, or without knowing the position in which they were placing themselves by accepting the mortgage as framed, in the event any of the claims of their co-beneficiaries were fraudulent, such ignorance, under the circumstances, can not be invoked as an excuse, for they must be presumed to have known what an examination of the mortgage which they accepted would have disclosed. Had they examined the instrument before accepting it, and thereby concurring in its terms, they, no doubt, would have discovered that under and by its terms, if they accepted it, they must assent to the direction of the mortgagor that the claims of Gates and Harrison should stand on a parity with their own. The Chicago bank, had it made an examination, would also have discovered that it must, by accepting the mortgage security, consent that the claims of Gates and Harrison should be preferred over its own. Such an examination would have further disclosed undoubtedly to these beneficiaries that the intent or purpose of the instrument, under its terms, was, that it should be enforced, in respect to the payment of the claims therein secured, as an entirety, and that by accepting it they must concur in its intent as revealed by its provisions. Having concurred in the intent of the mortgage by agreeing to its terms as therein fixed, it must follow that if the enforcement of the instrument as a whole will operate as a fraud, or will invade the legal rights of the company's unsecured creditors, the beneficiaries or mortgagees must be deemed to have intended such necessary results, for, under such circumstances, it is the le-

gal and not the moral intent which the law regards as controlling. It was certainly the duty of these beneficiaries, under the circumstances, to investigate as to whether or not any of the claims which they were consenting should stand inseparably on an equality with their own in their payment were illegal or fraudulent. If they discovered any of that character they could have rejected the mortgage as framed and have stood on their rights as unsecured creditors. Having inseparably connected or united themselves with evil or fraud, they must, in a legal sense, be deemed to be participators therein and must suffer the consequences of their act.

If it could be said that under the circumstances in this case knowledge of the insolvency of the company was essential, the following state of facts disclosed by the court's finding would certainly have force in determining that question. It appears that the mortgagees or beneficiaries other than Gates and Harrison were not, at or previous to the time the mortgage was executed, pressing their claims for payment, or demanding security for the same. Mr. Perkins, the trustee, on the day following the execution of this instrument, went on a special mission to Chicago, for the sole purpose of delivering the new note executed by the company to the Chicago bank, which was included in the mortgage, and to advise the latter of the execution of the security. On arriving at that city in the night-time, he secured a carriage and immediately drove to the residence of the bank's president, and there in an interview with him delivered this note and gave him the information in respect to the mortgage being executed. Mr. Hord, the law partner of Mr. Perkins, and one of the company's attorneys, about the same time, at the instance of Perkins, went to New York City for the sole purpose of delivering to the Eppens, Smith & Weiman Company its note, and to inform it that the mortgage had been executed, all of which duty he seems to have performed. Nicholas McCarty, another one of the beneficiaries, is shown to have been present at the time the mortgage was prepared

and executed, and he at once accepted the benefits thereof, both for himself and his nephew, Nicholas McCarty Harrison. It is further disclosed that Nicholas McCarty at the time he accepted the mortgage knew the consideration of the notes secured therein to Gates and Harrison. The beneficiaries mentioned, as well as their co-beneficiaries, who were notified of the execution of the mortgage, must, in reason, have known that the company, by allowing the mortgage to be placed on the public records, would necessarily thereby impair its credit as a going concern. In view of the foregoing facts it would certainly seem that they had reasonable grounds to suspect or believe that the company in executing this instrument, under the circumstances, was as a going solvent corporation acting at least outside of the ordinary course of business. These facts ought to have been sufficient to put an ordinarily prudent person upon inquiry, and a reasonable inquiry or investigation on the part of these beneficiaries would certainly have revealed the fact that the company was insolvent. Where a person has notice of such facts or circumstances which ought to put him upon inquiry, but, instead of doing so, studiously avoids making any inquiry, the law will impute to him notice of such facts as he could have ascertained had he exercised ordinary diligence. Wade on Notice, §11.

Without further considering the question in respect to the invalidity of this mortgage, we conclude that as against appellant Reagan it ought to be held entirely void. Hence, the court, under the facts, erred in not so adjudging.

The decision of the trial court in respect to the invalidity of the second mortgage of December 27, 1897, is also called in question. The facts relative to this mortgage disclose that on the same day that it was signed by the company and delivered to the trustee and in a very short time thereafter before any of the beneficiaries therein named had accepted it or even had any knowledge of the fact that it had any existence, the company made and caused to be recorded, as

provided by law, a general statutory assignment of all of its property, including that embraced in the mortgage in question, to an assignee or trustee, for the benefit of all of its creditors. It is contended by the parties adverse to this mortgage that under these circumstances, as against the gen·eral assignment deed, no title or interest in or to the mortgaged property passed to the beneficiaries as against the intervening rights of creditors, arising out of the assignment, because the mortgage was not accepted by the beneficiaries before the assignment deed was filed for record. That a deed or mortgage, in order to be effectual against the rights of third parties, must not only be delivered, but must also be accepted by the grantee or mortgagee before the rights of such third party intervene, is firmly settled by the decisions of this court. *Goodsell* v. *Stinson,* 7 Blackf. 437; *Woodbury* v. *Fisher,* 20 Ind. 387, 83 Am. Dec. 325; *Evans* v. *White,* 53 Ind. 1; *Tharp* v. *Jarrell,* 66 Ind. 52; *Eaton* v. *McKahan,* 91 Ind. 109; *Jones* v. *Loveless,* 99 Ind. 317; *Owen* v. *Williams,* 114 Ind. 179; *McFadden* v. *Ross,* 14 Ind. App. 312.

In *Dale* v. *Rodman,* 3 Metcalf 139, the plaintiff claimed under a mortgage deed which was made by her debtor without her knowledge and which she had neither accepted nor ratified before the mortgaged property had been duly assigned to the defendant under the insolvent laws of Massachusetts. The court held in that appeal that any acceptance or ratification on the part of the mortgagee after the statutory assignment in question could not avail to intercept the title of the assignee to the property assigned to him. The same rule is asserted in Jones on Chat. Mort. (4th ed.), §§104, 113. In the first section, the author states the rule as follows: "A mortgage executed by a debtor to his creditor without the knowledge of the latter, and without authority from him, and delivered to a stranger or to the mortgagor's attorney for his use, does not vest the title to the property in the mortgagee as of the time of such delivery, as between him

and a creditor of the mortgagor who has acquired an interest in it by attachment or levy of execution between the time of such delivery and the mortgagee's acceptance of the mortgage after receiving notice of it." To the same effect see, *Welch* v. *Sackett,* 12 Wis. 270; *Miller* v. *Blinebury,* 21 Wis. 684; *National State Bank, etc.,* v. *Morse,* 73 Iowa 174, 34 N. W. 803, 5 Am. St. 670.

In this latter case it is asserted that "No person can be said to agree to that of which he is ignorant." As the assignment in question was made and recorded before the mortgage was accepted by any of the beneficiaries, it will, for the reasons stated, prevail over the mortgage, for it is settled under our insolvent laws that on filing the assignment deed all of the debtors' property will *eo instanti* pass to the assignee and be brought under the jurisdiction and control of the court. §2900 Burns 1901; *New* v. *Reissner,* 56 Ind. 118; *Forkner* v. *Shafer,* 56 Ind. 120; *Seibert* v. *Milligan,* 110 Ind. 106; *Voorhees* v. *Carpenter,* 127 Ind. 300.

As the mortgaged property had passed under the supervision and control of the court, the beneficiaries could not, by accepting the mortgage thereafter, have their acceptance relate back and thereby make the mortgage effectual as a lien prior to the recording of the assignment deed. The relation between the insolvent debtor and his assignee after a statutory assignment has taken effect does not rest on contract alone. Their relations to each other and the respective relations of the assignee and the assignor's creditors are fixed by law. But it is contended that the mortgage in question was for the benefit of the mortgagees therein named, hence the law will presume or imply their assent thereto until the contrary appears. But the rule asserted by the authorities in such cases is that in order to justify a presumption of acceptance of a deed or mortgage it must clearly appear to be for the benefit of the beneficiaries therein and not burdened with conditions which will deprive them of

some material right. *Alliance, etc., Co.* v. *Eaton,* 86 Tex. 401, 25 S. W. 614, 24 L. R. A. 36.

This second mortgage executed by the company to Perkins as trustee, by its express terms is made subordinate and subject to the first mortgage of December 21st. An acceptance thereof by virtue of this condition would, as previously shown, have precluded the acceptors from assailing the fraudulent claims of Gates and Harrison. Again, by accepting it they would be required to assent to the payment of all of the claims secured by the first mortgage, which in the aggregate amount to $130,000 and over, before anything could be paid out of the proceeds of the mortgaged property upon their own claims. They would also by their acceptance be required to assent to the proposition provided by the terms of the second mortgage which is to the effect that in the event the holders of all the indebtedness secured by the first mortgage and a majority in amount of the second should so direct, that Perkins, as trustee, might continue to carry on the business of the company and purchase additional goods. They were also required by this mortgage to accept notes which were not payable until thirty days after date, and which, if accepted, would deprive them of taking any immediate action as creditors, which they otherwise would be entitled to do but for the acceptance of such thirty-day notes for their claims. Under such circumstances and conditions, the law will not imply or presume their assent to such a mortgage. See Perry on Trusts (2nd ed.), §206e, and the many authorities collected under foot-note 5, in 24 L. R. A., p. 376.

As a rule, mortgages like the one under consideration rest on contract between the mortgagor and the mortgagees, and so long as the latter may refuse or decline to accept the security on the terms and conditions offered, the mortgagor is not bound. It is true that there are some decisions of sister states which apparently hold that the assent of a mortgagee is not necessary in such cases, but these decisions run

counter to the great trend of the authorities. Neither can the proposition be sustained that because Perkins accepted the trust created by the mortgage, that such acceptance on his part must be considered as inuring to the benefit of the mortgagees, and must be viewed as an acceptance in their behalf until they repudiate the same. It certainly must be true as a legal proposition that a debtor who has executed a mortgage for the benefit of some of his creditors can not appoint an agent to act for them in accepting such mortgage. Perkins was selected by the company as its trustee or agent to carry into effect the provisions of this mortgage, but in no sense can he be regarded as the agent of the beneficiaries before their acceptance of the terms and provisions of the mortgage. They must be considered as having the privilege, when such a mortgage deed as the one in controversy is tendered to them, either to accept or reject it, and until they accept it there can be no effectual contract existing between the mortgagor and them. Had the beneficiaries notified Perkins, the trustee, of their acceptance before the assignment in controversy was recorded, their rights to the mortgaged property, so far as the question of acceptance, as here involved, is concerned, would have been superior to those of Reagan under the assignment. *McLaughlin* v. *Carter,* 13 Tex. Civ. App. 694, 37 S. W. 666. But as it expressly appears that they did not accept the mortgage before the filing of the assignment deed for record, the mortgage, therefore, can not be enforced as against the rights of creditors under the assignment, and the decision of the trial court adjudging the instrument invalid as against Reagan, the assignee, was right, and should be affirmed.

It is contended on behalf of Alfred B. Gates that the latter was, under the provisions of the statute controlling his preferred stock, in fact, a creditor of the company, and a preferred stockholder in name only. Be this question as it may, the statute, as we have seen, expressly declares that when the corporation has become insolvent, that the debts

and liabilities held against it shall be paid in preference to such preferred stock. Consequently, if the stock be viewed in the nature of an indebtedness it will not relieve such creditor, under the circumstances in this case, of the force and effect of the statute. If the Gates' note in question had been in good faith accepted for the surrender of his stock before the company had become insolvent, perhaps a different question might be presented, but when the company had once become insolvent, its rights or authority to merge this stock into a note and then prefer it as it did over the payment of the claims of its *bona fide* creditors, is, according to the letter and spirit of the statute, forbidden. Even though it may be regarded in the nature of an indebtedness, and not stock as denominated by the statute, still, under the circumstances, the preference accorded to it by the mortgage could not be sustained. When such company becomes insolvent it is immaterial whether such stock then continues to be evidenced by a stock certificate or is merged into a promissory note, it, under the provisions of this positive statute, must be postponed in its payment until all the other debts are paid. The law does not regard the shadow of the thing, but rather the substance, hence, the fact that a note may have been executed for the surrender of this stock, does not enlarge the right, under the law, of the stockholders.

We are constrained to conclude that both of the mortgages in dispute should be held void and ineffectual so far as appellant Reagan is concerned; therefore, the court erred in sustaining and enforcing in part the mortgage of December 21, 1897. The judgment of the court so far as it adjudges the mortgage of December 27, 1897, to be invalid, is affirmed, otherwise it is reversed, and the cause is remanded to the lower court, with instructions to restate its conclusions of law on the special finding and hold that the mortgage of December 21, 1897, is wholly void, so far as the same affects the rights of Reagan, the trustee, and render judgment accordingly.

### On Petition for Rehearing.

Jordan, C. J.—Certain ones of the losing parties in this appeal petition for a rehearing. The first of these petitions is presented by the Southern California Packing Company and others therewith associated. The second petition is presented by the Indiana National Bank, Capital National Bank, First National Bank of Chicago, Nicholas McCarty, and Eppens, Smith & Wieman Company. The petitioners in the first mentioned petition in support of their petition refer us to the argument and authorities in the original brief, and the sole ground upon which they rest their petition for rehearing is, that this court in its opinion failed expressly to consider and pass upon the grounds presented by them at the former hearing in respect to the invalidity of the claims of the New York banks. These petitioners filed no motion in the trial court for a new trial, and hence the ruling of that court of which they complain is its conclusion of law affirming the validity of the claims mentioned upon the special findings. Paragraph eight of the court's finding discloses that the notes in question were all executed and issued by the Krag-Reynolds Company, through its proper officials, for money advanced by the several banks, which money was deposited to the credit of said company in the Importers and Traders National Bank of New York; that the company was notified of such deposit and thereupon drew out a portion thereof and used the same in its business. Part of this deposit, as it appears, was checked out by Charles M. Reynolds, the principal manager of the company, and by him misappropriated. It is disclosed, however, that the banks in controversy advanced the money in good faith, in the due course of business, on the notes executed by the company, without any knowledge or reason to believe that Reynolds had any intention of using any part of the money for other than the legitimate purposes of the corporation. Certainly upon these facts the trial court could

declare no other conclusion than it did in its seventh conclusion of law, whereby it held and declared that the notes in question were valid and legal claims against the Krag-Reynolds Company. This conclusion under the facts found was fully authorized, and the judgment of the trial court thereon is affirmed.

The petition for a rehearing of the Indiana National Bank and others is apparently based on the fact advanced and asserted therein that we should at the former hearing have accepted the contention of these parties, that they as a part of the beneficiaries of the mortgage in dispute have a standing thereunder which is independent and separate from that of Gates and Harrison, who are virtually conceded to be fraudulent claimants. In other words, the contention of the parties is renewed to the effect that, although the Krag-Reynolds Company, an insolvent concern, in the fulfilment of the promise made by it to Gates and Harrison in order to obtain their consent to the execution of the mortgage, agreed, under the terms of this instrument, to turn over to these preferred stockholders $50,000 of its assets, which the law required should be applied on the claims of its other creditors, and further provided and stipulated that the petitioners herein and the stock claimants, their co-beneficiaries, should share *pro rata* and equally with each other in the distribution of the proceeds of the mortgaged property, to all of which stipulations these petitioners agreed and consented, still, notwithstanding these facts, they should be permitted, over the protest of Gates as well as that of Reagan, the trustee, to repudiate the mortgage so far as it secures the fraudulent claims of Harrison and Gates, but be awarded its benefits so far as they themselves are concerned. This contention was fully considered and denied at the former hearing, and what is asserted in support of the petition for a rehearing does not convince us that, in so holding, we committed an error. It is said that the sole purpose of the officials of the corporation in executing the trust mortgage was to secure its *bona fide* debts. That may have been its original

purpose, but when it was confronted with the fact that it could not exercise this right without the consent of its two preferred stockholders, it then, to an extent at least, seems to have departed from this purpose, and by executing the mortgage it is shown to have designed and intended to secure, in violation of law, the stock claims of Gates and Harrison, as a reward for the consent of the latter that the instrument might be executed. Counsel seemingly overlook the fact that the very thing which made it possible for the corporation to execute the mortgage at all was the illegal agreement between it, Gates and Harrison, to the effect that their stock claims should be secured by the mortgage as a reward for their consent to its execution. That was the consideration for their consent, and the evil thereof under the stipulations and terms of the mortgage permeated the instrument as an entirety. The company at the time, as shown, was insolvent, and by reason of that situation was forbidden by a positive statute to carry this agreement into effect. Its officers, under the circumstances, were confronted with the proposition that in order to carry out the preferences which they desired to give to some of the creditors they must first secure the consent of Gates and Harrison, or otherwise the claims of those which they desired to prefer must go unsecured. To obtain the requisite consent they were, under the agreement, required to include at least the claim of Gates in the proposed mortgage, and thereby violate the statute, and perpetrate a fraud on their other creditors. They seem to have adopted the latter, and in carrying out this fraudulent purpose, or scheme, the mortgage was so formulated as to stipulate and direct that the fraudulent claims of Gates and Harrison should stand on a parity and be paid along with those of the other beneficiaries, except the Chicago bank. To all the stipulations, provisions, and directions as embodied in the mortgage each and all of the petitioners herein agreed and consented, when they accepted the instrument as tendered, and thereby permitted their claims in respect to the payment

thereof to be inseparably linked and united with those of
Gates and Harrison. And now when confronted with the
effect of their agreement they contend that it should be abro-
gated, or in other words, that the court in granting the de-
mand or prayer of appellant for the annulment of the
mortgage shall eliminate the fraudulent claims therefrom
and leave the instrument as to their own claims untouched.
That so far as the mortgage fixes the rights of Gates and
Harrison in respect to the payment of their claims along
with those of the petitioners, the latter virtually concede that
it should be annulled, but so far as it concerns and benefits
themselves they insist it must be upheld and enforced.
While repudiating or disowning the contract in which they
concurred whereby the rights of these stock claimants were
fixed in conjunction with those of their own, they in the
same breath insist that their interests or rights as declared
and fixed by the mortgage must be maintained. The mort-
gage when tendered disclosed by its terms that it proposed,
if accepted, to create contractual relations, not only between
the acceptors and the mortgagor, but also among the latter
in regard to the rights of each in sharing in the application
of the proceeds of the mortgaged property to their respective
claims. An examination of the mortgage as tendered cer-
tainly revealed its peculiar character or nature and the
rights of the parties as therein fixed under its expressed
terms and stipulations. If they accepted it at long range,
or with eyes closed, they, when confronted with its fraudu-
lent features to which they assented, can not relieve them-
selves of the situation in which they are placed under their
agreement by successfully demanding that the mortgage, so
far as it concerns their interests, shall be sustained, but
avoided so far as the claim of Gates and Harrison is con-
cerned. Certainly it must be evident that under the cir-
cumstances they are not in a position to avail themselves of
the benefits thereof and at the same time dispute the rights
of Gates and Harrison, by whose consent they were enabled
to obtain the benefits of the security for which they now con-

tend.   Having accepted the instrument and concurred in what may be termed its evil or fraudulent provisions, they can not seek to avail themselves of their rights as fixed in connection with those of the fraudulent claimants, and at the same time repudiate or deny the rights of the latter which stand on a parity with their own.   Therefore, being unable, under the facts, to defend against the demand of appellant in this action that the mortgage in question shall be avoided, and being further unable to show that under the circumstances they are entitled to have the fraudulent claims separated from their own and eliminated from the security, the court must yield to the prayer of appellant that the instrument by reason of the fraud imputed to it be annulled in its entirety.   We may again repeat that the petitioners herein accepted the mortgage merely as a security for preëxisting debts without any new or additional consideration, hence the avoidance thereof will place them in no more unfortunate situation in respect to the payment of their claims than they occupied at the time they accepted the security.   The insistence of counsel that if the decision in this appeal is permitted to stand it will become a mischievous precedent and one that will be injurious to commercial business, is entirely without merit.   The decision is to be construed in respect to the circumstances and facts upon which it rests.   No questions in regard to innocent holders of commercial paper, on of like import, are involved.

We have fully examined all of the authorities cited by the learned counsel for the petitioners and have fully considered their arguments, but discover no authorities which can be said to be at variance with the proposition, that where a party, as in this case, has by contract precluded himself from attacking a conceded fraud which is impressed upon an instrument under which he claims, he must accept the consequences of such fraud.

We are of the opinion that the ultimate conclusion reached at the former hearing is right, and therefore each of the petitions for a rehearing is overruled.